FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

JAN 20 2026

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA — SOUTHERN DIVISION

TRENT CHARLTON, an individual; and EMILY CHARLTON, an individual,

Plaintiffs,

v.

DEBORAH L. PAULY, an individual; LEX REX INSTITUTE, a California

nonprofit corporation; SHEILA A. CHARLTON, an individual; and DOES 1–25,

inclusive,

Defendants.

Case No.: 8:26-cv-00085-JWH (DFMx)

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

(1) 18 U.S.C. § 1962(c) (RICO)

(2) 18 U.S.C. § 1962(d) (RICO Conspiracy)

(3) Malicious Prosecution (California) — (Trent Charlton Only)

(4) Abuse of Process (California)

(5) Cal. Civ. Code § 52.1 (Bane Act)

DEMAND FOR JURY TRIAL

I.     INTRODUCTION

1. This action arises from Defendants coordinated misuse of California restraining-order procedures as a coercive vehicle to extract Plaintiffs' valuable real-property interests through threats of criminal prosecution, stigmatizing allegations, and prolonged litigation pressure.

2. This case is not pled as a family dispute. It is pled as a civil racketeering and abuse-of-process case: Defendants used the State's restraining-order machinery— especially the ex parte elder-abuse TRO pathway—to impose immediate coercive burdens and then used threats of criminal accusation/prosecution to demand a property surrender.

3. The coercive quid pro quo is memorialized in writing and corroborated under oath (Feb. 11, 2025, Tr. at PDF p. 132:18–26.). In an October 21, 2024, email, Defendant Pauly explicitly framed "benefits" including that Plaintiff Trent "avoids criminal charges," while urging counsel to emphasize "provable wire fraud." (Ex. A.) On February 11, 2025, Defendant Sheila Charlton testified under oath that if Plaintiffs surrendered their property interest, she would not pursue criminal charges, and that if they did not surrender their property interest, she would pursue criminal charges.

4. A court-appointed neutral professional independently concluded the restraining-order relief sought was not appropriate. The Guardian ad Litem ("GAL"), W. Rod Stern, reported that the restraining orders sought were "not appropriate solutions for the issues being raised." (Ex. C.) Despite this notice, Defendants continued prosecuting the case.

5. On February 19, 2025, the Superior Court denied the EARO petition in full, denied any request to extend the Temporary Restraining Order, dissolved the TRO, and denied Defendant Pauly's motion to stay enforcement pending appeal, among other rulings. (Ex. B.)

6. Plaintiffs incurred approximately $76,750 in out-of-pocket damages defending against and responding to Defendants' coercive campaign, in addition to severe emotional distress, reputational harm, and interference with Plaintiffs' property interests.

7. Plaintiffs seek relief under RICO and California law for Defendants' extortionate scheme and misuse of process.

## II. CORE NARRATIVE: PROPERTY-LEVERAGE SCHEME USING EX PARTE RESTRAINING ORDERS AND CRIMINAL-STIGMA THREATS

8. This case arises from Defendants coordinated use of ex parte restraining-order process and criminal-stigma accusations to pressure Plaintiffs into surrendering property interests in the Follyhatch Property. The scheme operated through filings and electronic transmissions that framed an alleged "danger" narrative, while the underlying dispute was repeatedly revealed—by neutral findings and sworn admissions—to be a civil property-control conflict.

9. The restraining-order pathway was initiated ex parte, imposing immediate restrictions and firearm surrender obligations before Plaintiffs received any meaningful opportunity to be heard. The restraints remained in place for approximately 244 days, during which Plaintiffs incurred substantial compliance costs, attorneys' fees, and household disruption.

10. Early in the proceeding, the Court appointed a Guardian ad Litem ("GAL"). The GAL later issued a written report advising that restraining orders were "not appropriate solutions" for the issues being raised and that the allegations did not present the type of threat properly addressed by the requested protective orders. (Ex. C.)

11. As the case proceeded, Sheila Charlton's sworn testimony repeatedly undermined the alleged "danger" narrative used to justify the restraining-order relief, including through admissions inconsistent with the core claims advanced in police reports and filings.

12. On October 21, 2024, Defendant Pauly transmitted an email to Plaintiffs' counsel explicitly linking "benefits" of avoiding criminal charges to surrender of

Plaintiffs' property interests, while referencing "provable wire fraud." (Ex. A.) The communication framed criminal jeopardy as leverage in a property dispute.

13. On February 11, 2025, under oath, Sheila Charlton admitted that her criminal-pursuit posture was conditioned on Plaintiffs surrendering their property interest: she testified that if Plaintiffs gave their property interest to her, she would not pursue criminal charges, and if they did not, she would pursue criminal charges. (Feb. 11, 2025, Tr.)

14. Despite this neutral notice and sworn record undermining the asserted "danger" narrative, on January 31, 2025 Defendant Pauly moved to admit the May 27, 2024, Irvine Police Department report (IPD Case 24-05638) into evidence, and it was marked as Exhibit 38. (Jan. 31, 2025, Tr.) The report was used as an "official" exhibit to reinforce the same criminal-stigma and dangerousness framing that the record had already called into question. The same manufactured "danger/abuser" framing and criminality narrative advanced through police reporting and restraining-order filings was further undermined by the Court's finding that Sheila Charlton testified to a "2020 restraining order" that did not exist—reinforcing that

the asserted safety predicate was unreliable and deployed as leverage in a property dispute.

15. On February 19, 2025, the Superior Court denied the petition in its entirety and dissolved the TRO. The Court further found that the filing of the elder abuse restraining order was motivated by Sheila Charlton's desire to be the sole owner of the Follyhatch home, and it found Petitioner's testimony unreliable, including testimony about a "2020 restraining order that did not exist." (Feb. 19, 2025, Tr.; Ex. B.)

16. Immediately after the merits disposition, Defendant Pauly sought to prolong restraints and delay enforcement through stay/appeal posture. The Court denied the stay request and confirmed the restraints were not warranted. (Ex. B; Feb. 19, 2025, Tr.)

17. In subsequent post-termination fee proceedings, Defendant Pauly continued to use abusive/danger framing against Trent Charlton notwithstanding the merits disposition, while the Court finalized fee and GAL awards. (Nov. 17, 2025, Tr.)

## II.    JURISDICTION AND VENUE

18. This Court has original jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including 18 U.S.C. § 1961 et seq. (RICO).

19. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' California claims because they arise from the same nucleus of operative facts.

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in Orange County, California within this District, including the filing and prosecution of the restraining-order matters and resulting harms suffered by Plaintiffs in this District.

## III.    PARTIES

21. Plaintiff Trent Charlton is an individual residing in Irvine, California.

22. Plaintiff Emily Charlton is an individual residing in Irvine, California. Emily is Trent's spouse and co-owner of the property at issue and suffered direct and foreseeable injury from Defendants' conduct directed at Plaintiffs' household and property interests.

23. Shared Property Interest and Foreseeable Injury to Emily Charlton. Although the underlying restraining-order proceedings initially named Trent Charlton as the respondent, Defendants' alleged objective—obtaining sole ownership and control of the Follyhatch Property—necessarily implicated and foreseeably harmed Emily Charlton's co-ownership interest. Any coerced surrender, compelled restructuring of title, or "sole ownership" outcome would materially impair Emily Charlton's property rights as a co-owner. Defendants' use of criminal accusations and restraining-order process as leverage therefore targeted the shared ownership structure and proximately injured Emily Charlton in her own business and property interests.

24. Defendant Sheila A. Charlton is an individual residing in Irvine, California. She was the petitioner in the underlying restraining-order matters and acted in

concert with the other Defendants to pursue coercive relief aimed at extracting

Plaintiffs' property interests.

25. Defendant Deborah L. Pauly is an attorney licensed to practice law in

California (State Bar No. 350345). She acted as counsel to Sheila Charlton during

the relevant period and directed communications and litigation acts central to the

misconduct alleged herein.

26. Defendant Lex Rex Institute is a California nonprofit corporation with its

principal place of business in Long Beach, California. It provided the institutional

platform through which Pauly acted, appeared in court, and transmitted

communications central to the misconduct alleged. At all relevant times, Pauly

acted as an agent and within the scope of her relationship with Lex Rex Institute in

providing legal services and communications in the restraining-order proceedings.

27. DOES 1–25. Plaintiffs are informed and believe, and on that basis allege, that

DOES 1–25 participated in, directed, authorized, ratified, facilitated, and/or aided

and abetted one or more of the wrongful acts alleged herein. Plaintiffs will amend

this Complaint to allege their true names and capacities when ascertained through

discovery and third-party process.

## IV.    DOCUMENTS INCORPORATED BY REFERENCE

28. Pursuant to Fed. R. Civ. P. 10(c), Exhibits A–C are incorporated by reference

and form part of this Complaint. Plaintiffs attach Exhibits A–C solely to identify

and accurately describe the written communication and court-filed records

referenced herein.

## V.    FACTUAL ALLEGATIONS

A. The Property at Issue and Defendants' Objective

29. In 2019, Plaintiffs and Defendant Sheila Charlton acquired a residence located

at 287 Follyhatch, Irvine, California (the "Follyhatch Property"), valued at

approximately $1.3 million.

30. Plaintiffs held approximately a two-thirds ownership interest, and Sheila held approximately a one-third ownership interest.

31. Since approximately April 2020, Plaintiffs have not had physical access to, or use of, the Follyhatch Property, which has been occupied by Sheila Charlton. Notwithstanding their lack of access, Plaintiffs have continued to pay and/or contribute substantially to ongoing carrying costs associated with the Property, including mortgage and property-tax obligations. This context is material to the parties' dispute and to Defendants' subsequent demands and process strategy concerning title and ownership interests.

32. Defendant Sheila Charlton sought to become the sole owner of the Follyhatch Property. Rather than pursue ordinary civil property remedies designed for such disputes, Defendants chose to weaponize restraining-order processes to obtain leverage and coerce property surrender.

33. Interdependent Ownership Interests. Because Plaintiffs' ownership interests in the Follyhatch Property were interdependent, Defendants' alleged property-extraction objective could not be achieved without impairing Emily Charlton's co-

ownership interest. The pressure campaign therefore foreseeably targeted the entire

ownership structure—through demands, coercive restrictions, and threatened

criminal referral—creating escalating economic pressure on both Plaintiffs to

capitulate and surrender property rights.

B. Pattern Background: Prior Property-Demand Communications (2020)

34. The coercive "property surrender" objective did not originate in 2024. Years

earlier, prior counsel communications to Plaintiffs reflected the same asserted

objective: that Sheila Charlton desired to have the Follyhatch Property in her name

alone and sought to pressure Plaintiffs to restructure or surrender interests in

connection with accusations of wrongdoing.

35. On or about May 19, 2020, counsel for Sheila Charlton sent a written demand

letter to Plaintiffs referencing financial accusations and stating that "Sheila desires

that her home be in her name alone," among other demands related to the

Follyhatch Property and Plaintiffs' handling of financial matters. 05/19/2020 wire

transmission (property-control objective).

36. On or about October 22, 2020, different counsel sent a further letter threatening

potential "elder abuse" litigation and related civil actions while again asserting that

Sheila Charlton intended to have the Follyhatch Property and related loan

obligations placed in her name alone, among other demands and accusations.


37. Plaintiffs allege these 2020 communications as background evidence of

continuity and motive: the recurring objective to obtain sole ownership/control of

the Follyhatch Property through pressure campaigns tied to accusations of criminal

or abusive conduct, culminating in the 2024–2025 restraining-order proceedings at

issue here.


38. On or about May 19, 2020, Sheila Charlton, acting through counsel Lynn E.

Moyer, transmitted by email to Plaintiff Trent an attached letter asserting that

Sheila desired the home and loan solely in her name and sought removal of

Plaintiffs from title and loan. This wire transmission evidences the Enterprise's

property-control objective and the use of counsel-mediated transmissions to press

that objective.

39. Criminal-referral escalation playbook (APS → IPD → OCDA). The continuity of Defendants' approach is reflected not only in recurring "property surrender" demands, but also in a recurring escalation method designed to manufacture criminal stigma and increase coercive leverage. In the earlier 2020–2021 phase, Sheila Charlton's counsel-directed accusations were routed through Adult Protective Services and Irvine Police Department channels, and IPD personnel documented an OCDA Real Estate Fraud Unit referral pathway, including briefing a DA investigator and packaging materials for delivery to the Orange County District Attorney's Real Estate Fraud Unit. Plaintiffs allege this APS/police/DA routing was used to elevate a private title-and-money dispute into a criminally framed pressure campaign. Defendants later replayed the same method in 2024–2025—escalating accusations through law-enforcement/economic-crimes channels while contemporaneously pursuing restraining-order leverage and title-control objectives—further evidencing a related and continuous pattern rather than isolated petitioning activity.

40. Pattern Background: APS/Police/DA Escalation as "Manufactured Criminality" Method (2021). The Enterprise's criminal-stigma leverage strategy followed a repeatable escalation path: counsel-supported accusations were routed through

administrative "elder" channels and law-enforcement intake to elevate a civil property dispute into a purported criminal matter for third-party reliance.

41. In January 2021, the Irvine Police Department narrative reflects that IPD "received all documents related with Sheila's case from her Attorney Lynn Moyer," that "Lynn verified her client was desirous of prosecution," and that the reporting officer thereafter treated the matter as criminal financial elder-abuse exposure rather than a civil ownership dispute. The same narrative includes an "Adult Protective Services" escalation component and states that, based on the documentation reviewed, "this case would best be handled by the Real Estate Fraud Unit with the Orange County District Attorney's Office."

42. The reporting officer further documented speaking with "DA Investigator Harley Wing" assigned to the OCDA Real Estate Fraud Unit, that Wing requested the case and supporting documentation be "packaged up" for OCDA review, and that the case would be "hand delivered" to the OCDA Real Estate Fraud Unit in Santa Ana. Plaintiffs allege this APS → police → DA-routing method was later redeployed in 2024–2025 to reinforce a criminality narrative and obtain litigation leverage in the restraining-order proceeding and related property-control demands.

C. The DVRO Filing and Failure to Obtain Emergency Relief

43. On June 4, 2024, Defendant Sheila Charlton filed a request for domestic violence restraining orders in Orange County Superior Court, Family Division, using Judicial Council form DV-100, Case No. 24V001427 (the "DVRO Proceeding").

44. The DVRO Proceeding did not result in the emergency relief sought.

45. After failing to obtain the DVRO outcome sought, Defendants pivoted to an elder abuse restraining order strategy.

D. The EARO Filing, Ex Parte TRO, and Leverage Through State Process

46. On or about June 20, 2024, Defendant Sheila Charlton filed an Elder Abuse

Restraining Order petition in Orange County Superior Court, Probate Division,

Case No. 30-2024-01406840-PR-OP-CMC (the "EARO Proceeding").


47. Although the restraining-order proceedings were styled against Trent Charlton,

the TRO enforcement regime reached beyond him and directly impacted Plaintiff

Emily Charlton. As a practical consequence of the TRO and related enforcement

requirements, lawfully owned firearms associated with the Charlton household—

including firearms attributable to Emily Charlton—were surrendered for storage

and compliance, and Emily Charlton was deprived of the ability to possess or

access those firearms during the TRO period, despite not being named as a

respondent in the restraining-order application. These deprivations were

foreseeable and proximately caused by Defendants' use of restraining-order

process and criminal accusations as leverage directed at Plaintiffs' shared

household and property interests.


48. On or about June 21, 2024, the Court issued an ex parte Temporary Restraining

Order based on the petition, imposing immediate restrictions without Plaintiffs

having a meaningful pre-deprivation opportunity to be heard.

49. Restraining-order relief operates through State power. Once issued, it imposes coercive compliance burdens and creates immediate risk of contempt and criminal exposure for alleged violations. Defendants invoked that machinery to increase Plaintiffs' pressure and vulnerability in connection with Defendants' property objectives.

E. Court-Recognized Duplicative Tracks and Forced Election

50. At subsequent hearings, the Court recognized the impropriety of overlapping DVRO/EARO tracks and required Defendants to proceed under a single path. Defendants elected to proceed under the EARO framework.

50. The election reflected strategic forum selection: after failing to obtain desired relief in the DVRO track, Defendants pursued elder-abuse procedures that provided powerful immediate restrictions and stigmatizing leverage.

F. Guardian ad Litem Appointment and Neutral Findings (Exhibit C)

51. The Court appointed W. Rod Stern as Guardian ad Litem to independently investigate and advise the Court regarding the requested restraining orders.

52. On September 6, 2024, the GAL issued a written report concluding the restraining orders sought were "not appropriate solutions for the issues being raised," among other findings, and recommending denial and consideration of alternative remedies. (Ex. C.)

53. From at least September 6, 2024, forward, Defendants knew or should have known that extraordinary restraining-order relief lacked an objectively reasonable basis—yet Defendants continued prosecuting the proceeding and maintaining coercive pressure.

G. Case Trajectory/Continued Prosecution after Notice

54. On October 15, 2024, the Court raised a scheduling issue and asked whether 'the original time estimate was three hours in this matter.' Defendant Pauly

confirmed: 'Yes, Your Honor,' and further confirmed that the three-hour estimate was for her presentation. (Oct. 15, 2024, Tr. at 56:4–13.) On February 6, 2025, the Court revisited that representation and stated on the record that Ms. Pauly had previously represented her case-in-chief was 'roughly three hours,' and contrasted that estimate with the reality that the matter had become the eighth day and had consumed approximately 19–21 hours of court time, observing 'this has gone on a long time.' (Feb. 6, 2025, Tr. at 51–53.) When confronted with her prior representation, Pauly stated she did not 'remember' making it and conceded she was 'certainly off the mark.' (Feb. 6, 2025, Tr. at 52:2–4.) This Court-recognized disparity, together with continued prosecution after neutral notice and ultimate denial on the merits, supports Plaintiffs' allegations that Defendants used restraining-order process to impose extended coercive restrictions and economic pressure in pursuit of a property-control objective rather than legitimate protective relief. During the proceedings, the Court admonished Defendant Pauly on the record for conduct the Court characterized as "unprofessional," and directed that it "needs to stop." (Nov. 22, 2024, Tr. at PDF p. 89, lines 30–32.)

H. The Written Quid Pro Quo: October 21, 2024, Email (Exhibit A)

55. On October 21, 2024, Defendant Pauly sent an email to Plaintiffs' counsel stating, "Benefits to Trent" included that he "avoids criminal charges," while urging counsel to emphasize "provable wire fraud." (Ex. A.)

56. Exhibit A reflects the coercive architecture alleged here: avoidance of threatened criminal jeopardy is expressly tied to surrender of Plaintiffs' property interest.

I.      The Sworn Quid Pro Quo: February 11, 2025, Testimony

57. On February 11, 2025, under oath, Sheila Charlton admitted that her criminal-pursuit posture was conditioned on Plaintiffs' surrender of their property interest. When asked: "Even today, it's your position that as long as Trent and Emily give their property interest to you, you will not pursue criminal charges; correct?" she answered: "Correct." When asked: "[I]f they don't give back the property, you will pursue criminal charges; correct?" she answered: "Yes," adding: "As a parent, I never reward bad behavior." (Feb. 11, 2025, Tr. at 132:18–26.)

58. The February 11 testimony corroborates Exhibit A's quid pro quo. The Court summarized this admission on the record, noting that Sheila "admitted on the stand" that "if they don't give the property back, she'll pursue criminal charges" and that "if they did give the property interest to her, she would not pursue criminal charges." (Feb. 11, 2025, Tr. at 135:2–7.)

   J. Favorable Termination with Prejudice and Judicial Findings (Exhibit B)

59. On February 19, 2025, the Superior Court denied the EARO petition in its entirety, dissolved the Temporary Restraining Order, deemed Respondent's motion to dismiss moot, denied any request to extend the TRO, and denied Defendant Pauly's motion to stay enforcement pending appeal, among other rulings reflected in the Court's minute order. (Ex. B.)

60. The Court found Petitioner's narrative unreliable, including because she testified to "a 2020 restraining order that did not exist," and then "later [had] to backtrack on that statement." (Feb. 19, 2025, Tr. at PDF p. 6, lines 22-25.)

61. 12/01/2025 wire transmission (record-sanitization). On or about December 1,
2025, Pauly transmitted by email to counsel/Guardian a request for "no malice"
language in connection with the record of the proceedings, reflecting
consciousness of wrongdoing and an attempt to influence how intent and improper
purpose would be reflected.

Each of the foregoing email and electronic-filing transmissions was sent via the
Internet and/or electronic case-filing infrastructure that constitutes an interstate
wire facility, satisfying the interstate-commerce element of 18 U.S.C. § 1343.

62. The Court further found that "the filing of an elder abuse restraining order was
motivated by Sheila Charlton's desire to be the sole owner of the Follyhatch
home." (Feb. 19, 2025, Tr. at PDF p. 7, lines 12–16.)

K. Post-Termination Proceedings and Enforcement Delay (Procedural History)

63. After the merits disposition, Defendants sought to delay finality and
enforcement, including by moving to stay enforcement pending appeal on February

19, 2025, and by continuing post-merits proceedings relating to fees and Guardian
ad Litem compensation. These post-merits steps delayed Plaintiffs' ability to obtain
final enforceable relief and increased costs. (Ex. B; Feb. 19, 2025, Tr. at PDF p. 14,
lines 1-26.)

64. On February 19, 2025—after the Court denied the petition and dissolved the
TRO—Defendant Pauly requested (i) an "extension of the temporary restraining
order for at least 21 days" and (ii) a stay "pending appeal, pursuant to CCP section
918," stating, "We're going to appeal." (Feb. 19, 2025, Tr. at PDF p. 12, lines 46–
54.) The Court denied the requested extension and declined to issue any stay,
stating it was "not going to issue a stay at this time," and that the order would
remain in effect. (Id. at PDF p. 15, lines 51–55; PDF p. 16, lines 30–44.)

65. On November 3, 2025, the Court convened post-merits proceedings concerning
the fee motions and Guardian ad Litem compensation. The Court stated it had
"reviewed all of the documents" and had "issued a tentative ruling," and then
asked: "where is Ms. Pauly?" (Nov. 3, 2025, Tr. at PDF p.5, lines 23-26.) Ms.
Pauly did not appear, and the Court continued the matter. (Id.) On November 17,
2025, the Court explained that while it had issued a tentative ruling previously, it

"hasn't become the final order of the Court," and proceeded to finalize the fee and

Guardian ad Litem awards and direct submission of proposed orders. (Nov. 17,

2025, Tr. at PDF p. 9, lines 17–20; PDF p. 25, lines 1–7.)

65(a). At the November 17, 2025, hearing, Ms. Pauly continued to characterize

Trent Charlton as having engaged in "abusive behavior," arguing that Sheila

Charlton had been left "in [a] condition" by the "abusive behavior of her son,"

notwithstanding the prior merits disposition. (Nov. 17, 2025, Tr. at PDF p. 20, lines

9-14.)

L. Damages

66. As a direct and proximate result of Defendants' conduct, Plaintiffs incurred

approximately $76,750 in out-of-pocket damages, in addition to emotional distress,

reputational harm, household disruption, and interference with Plaintiffs' property

interests.

67. Emily Charlton's damages include interference with her use and enjoyment of property, heightened household safety concerns, and medical treatment for anxiety, all proximately caused by Defendants' coercive course of conduct directed at Plaintiffs shared property interests.

68. During the TRO period, the restraining-order restrictions and related compliance burdens interfered with Plaintiffs' ordinary routines and use of nearby public spaces, contributing to household disruption and emotional distress.

VI.    ANTICIPATED "PETITIONING IMMUNITY" DEFENSES AND WHY THEY DO NOT APPLY

69. Defendants' conduct is not immunized as protected petitioning where it constitutes extortionate conduct and sham litigation used to obtain property through wrongful means.

70. The "sham" exception applies where the underlying litigation conduct is objectively baseless and pursued for an improper purpose.

71. Here, the neutral GAL report (Ex. C) provided notice that restraining orders were not appropriate, and the Court's February 19, 2025, ruling and minute order (Ex. B) reflect that the requested restraining order was denied in its entirety for insufficient evidence and that the TRO was dissolved. Those findings support the inference that Defendants' continued prosecution and quid pro quo threats were not for legitimate protective relief but for collateral property extraction through coercion.

VII. RICO CASE STATEMENT (SUMMARY)

72. Plaintiffs bring civil RICO claims because Defendants formed and operated an enterprise that attempted to obtain Plaintiffs' property interests through wrongful use of fear of criminal accusation/prosecution and through repeated use of interstate communications and litigation acts to advance that extortionate objective.

73. Enterprise: an association-in-fact consisting of Lex Rex Institute, Deborah Pauly, and Sheila Charlton, functioning as a continuing unit.

74. Additional Participants (Not Yet Named). The Enterprise also included

additional participants and/or facilitators who are not presently named as

defendants but who, on information and belief, assisted the Enterprise's objectives

by (a) exercising fiduciary and/or agency control through powers of attorney and

trust instruments; (b) holding financial incentive as beneficiaries and/or successor

fiduciaries; (c) participating in or being present for the preparation, submission, or

escalation of reports and statements used to justify coercive restraining-order

relief; and/or (d) communicating with Enterprise members regarding the use of

criminal accusations and restraining-order process as leverage in a property

dispute. Plaintiffs expressly reserve the right to amend this Complaint to add such

individuals as defendants upon confirmation of their roles through discovery and

third-party process.

75. On information and belief, Lex Rex Institute acted through its agents and

attorneys in connection with the services provided by Defendant Pauly in the

underlying proceeding. Plaintiffs further allege that Lex Rex-affiliated personnel

had familiarity with, and/or a preexisting professional relationship with, Pauly and

her clients, and that Lex Rex served as the institutional platform through which

Pauly acted and communicated in furtherance of the conduct alleged herein. Plaintiffs plead these facts for enterprise/agency context and anticipate confirming the scope of Lex Rex's role and relationships through discovery and third-party process.

76. Predicates. Hobbs Act extortion (18 U.S.C. § 1951) and wire fraud (18 U.S.C. § 1343), including through interstate email communications and electronic court filings used to obtain Plaintiffs' property interest and to maintain coercive restraints as leverage.

77. Pattern/Continuity. The Enterprise's acts were related and continuous over a substantial period and employed recurring methods to pursue the same property-control objective, including repeated property-demand communications; repeated use of "fraud" and criminal-exposure framing as leverage; continued escalation after neutral notice that restraining orders were not an appropriate solution; and repeated use of interstate communications and court filings to maintain coercive pressure. On January 31, 2025, Pauly moved to admit and elevate the May 27, 2024 Irvine Police Department report (IPD Case 24-05638) as an exhibit in the restraining-order proceeding, reinforcing a criminal-stigma narrative as part of the

leverage strategy in a property dispute. The same proceeding also reflected that a key "prior restraining order" narrative was false: on January 9, 2025, when the Court raised a purported "restraining order from 2020," Pauly conceded there was no 2020 restraining order. These acts, taken together with the written property-for-criminal-forbearance communication and subsequent sworn corroboration, plausibly allege a related, continuous pattern directed at obtaining Plaintiffs' property interest through wrongful leverage.

78. Injury. Trent Charlton suffered injuries as a direct and proximate result, including substantial out-of-pocket losses (including attorneys' fees and related costs incurred to defend and defeat the proceeding), reputational harm, and emotional distress. The damages and injury to Plaintiffs' property interests were proximately caused by Defendants' racketeering conduct. Emily Charlton's injuries include direct economic and property harms independent of emotional distress, including firearm-related compliance costs, attorneys' fees and litigation expenditures paid from joint and/or community funds, and impairment of her ownership interests and control with respect to the Follyhatch Property.

VIII. RICO ALLEGATIONS (APPLICABLE TO COUNTS 1–2)

A. Enterprise

79. Defendants Sheila Charlton, Deborah Pauly, and Lex Rex Institute (together with DOES acting as agents, intermediaries, and participants) formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise").

80. On information and belief, Lex Rex Institute provided an institutional platform and agency for the Enterprise by facilitating and/or enabling Deborah Pauly's handling of the elder abuse restraining order proceeding, including through communications and coordination consistent with an agency relationship. In a written communication to Plaintiffs' counsel, Alexander Haberbush—identified as acting as an agent for Lex Rex Institute—stated that the "clients were good friends of Deborah and specifically wanted her to handle it," reflecting a preexisting relationship and selection of counsel based on that relationship rather than a one-off, arm's-length referral. Haberbush's communication further reflected knowledge of the matter and Lex Rex's involvement, notwithstanding his characterization that the subject matter was outside Lex Rex's "normal wheelhouse." Plaintiffs allege that discovery and third-party process will confirm the referral pathway, the

duration and nature of the Lex Rex–Pauly relationship, and the extent of Lex Rex's role in facilitating the communications and actions alleged herein.

B. Purpose

81. The Enterprise's purpose was to obtain and retain control over Plaintiffs' property interests and to extract concessions concerning title/ownership by deploying a recurring method: (i) advancing materially false or misleading criminal-fraud narratives (e.g., "wire fraud," "ID theft," "elder abuse," "hacking"); (ii) escalating those accusations through counsel communications and law-enforcement channels; (iii) invoking coercive restraining-order process; and (iv) leveraging threats of criminal pursuit and reputational stigma to pressure property surrender.

81(a). Recurring Escalation Method (Purpose/Method). As part of its operating method, the Enterprise repeatedly escalated ordinary property and family disputes into a "fraud/criminality" posture by (i) generating or assembling counsel-supported materials and accusations; (ii) converting those accusations into one or more police reports; (iii) seeking routing of the matter into an economic

crimes/fraud investigator or detective track; and (iv) pursuing referral to the

District Attorney as leverage and pressure in connection with the Follyhatch

property dispute. On information and belief, this same escalation sequence was

used in 2020 and then repeated again in 2024–2025, reflecting a recurring

playbook rather than an isolated incident.

## C. Relationships and Structure

82. The Enterprise functioned through coordination among its participants: Sheila

Charlton supplied accusations and sought property control; counsel-actors

(including Pauly/Lex Rex) transmitted demands and criminal-fraud framing; and

the Enterprise used restraining-order process and threat-leverage to impose

coercive constraints and economic pressure on Plaintiffs. The Enterprise had

continuity and an ongoing structure sufficient to pursue its objective over time.

## D. Conduct

83. Defendant Pauly, acting through Lex Rex Institute, conducted and participated in the Enterprise's affairs through a pattern of racketeering activity, including wire communications and extortionate leverage tied to property demands.

E. Pattern and Continuity

84. The Enterprise's conduct reflects both closed-ended continuity (repeated, related acts spanning years) and open-ended continuity (a method capable of repetition whenever Plaintiffs resist title/ownership demands). The acts below show a consistent objective (property control), consistent methods (criminal-fraud framing + process leverage), and repeated transmissions and escalations through time.

F. Table X-A — Predicate Acts (18 U.S.C. § 1961(1))

1. **October 21, 2024** — *Deborah Pauly / Lex Rex → Plaintiffs' counsel (email)* — Written quid pro quo framing "benefits" of avoiding criminal charges and emphasizing "wire fraud" in connection with property surrender; extortionate leverage anchor.

2. **February 11, 2025** — *Sheila Charlton → Court (sworn testimony)* — Admits criminal-pursuit posture was conditioned on Plaintiffs surrendering property interests; corroborates extortion structure and intent.

### G. Table X-B — Continuity / Notice / Method (Non-Predicate Support)

1. **May 19, 2020** — *Lynn E. Moyer (for Sheila Charlton) / Sheila Charlton → Trent Charlton (email with attached letter)* — Demand that title/loan be placed solely in Sheila's name and that Plaintiffs be removed from title/loan; early property-control objective.

2. **July 14, 2020** — *Sheila Charlton / Irvine Police Department → OCDA referral pathway (police report/investigation)* — Narrative escalated through law-enforcement channels using attorney-supplied materials; establishes counsel→police→DA escalation method and continuity.

3. **October 22, 2020** — *Lynn E. Moyer (for Sheila) / Sheila → Ben Schwefel / counsel (email and U.S. mail letter)* — Accusations of fraud/elder abuse tied to stated goal of obtaining sole loan/house control; coercive narrative linked to property demand.

4. **July 28, 2021** — *Sheila Charlton / Irvine Police Department → DA referral pathway (police report)* — Renewed IRS/ID-theft framing (tax refund/stimulus narrative); repeated fraud narrative to law enforcement.

5. **May 27, 2024** — *Sheila Charlton / Irvine Police Department; Tricia Casale present (police report)* — Reasserts deed/title allegations and tax/stimulus claims; escalation immediately preceding restraining-order filings; role-context for Tricia's participation.

6. **June 20, 2024** — *Sheila Charlton (and counsel) → Elder Abuse Court (EA filings)* — Initiates ex parte elder-abuse restraining-order pathway; invokes coercive TRO leverage.

7. **September 10, 2024** — *Court-appointed Guardian ad Litem (Rod Stern) → Court/parties (filed report)* — Neutral notice that restraining orders were "not appropriate solutions"; supports continued prosecution after notice.

8. **February 19, 2025** — *Superior Court → parties (minute order/ruling)* — Petition denied in full; TRO dissolved; favorable termination supporting improper-purpose/sham narrative.

9. **December 1, 2025** — *Deborah Pauly → counsel/GAL (email)* — Requests "no malice" language post-termination; supports consciousness-of-wrongdoing / record-sanitization.

"Plaintiffs plead the predicate acts relied upon for Counts 1–2 herein; the foregoing summary is illustrative of related transmissions and acts evidencing continuity, intent, and enterprise method, and Plaintiffs will supplement identities and agency relationships as discovery and third-party process confirm participants and transmissions."

H. Predicate Acts (18 U.S.C. § 1961(1)) and Rule 9(b) Particularity

Table X summarizes both (i) racketeering predicates alleged with Rule 9(b) particularity and (ii) continuity/support acts showing method, intent, notice, and escalation. For avoidance of doubt, Plaintiffs' racketeering predicates include, at minimum, the October 21, 2024 extortionate email transmission (Table X, Item 8), the February 11, 2025 sworn quid-pro-quo admission confirming the extortion structure (Table X, Item 9), and the Enterprise's additional wire transmissions and electronic filings undertaken to advance the same property-control scheme as further detailed below. The remaining Table X entries provide continuity, notice, and context for the Enterprise's objective and methods.

85. Predicate Acts Alleged. The Enterprise engaged in racketeering activity

including:

(a) Wire Fraud (18 U.S.C. § 1343), and

(b) Hobbs Act Extortion (18 U.S.C. § 1951). Plaintiffs reallege ¶¶ 41–44.

Defendants used threats of criminal referral and prosecution as leverage to obtain

Plaintiffs' property interest in the Follyhatch home, including as memorialized in

Defendant Pauly's October 21, 2024 email to counsel (Ex. A) and corroborated by

Sheila Charlton's sworn February 11, 2025 testimony admitting that if Plaintiffs

surrendered their property interest she would not pursue criminal charges, and if

they did not surrender it she would pursue criminal charges. (Feb. 11, 2025 Tr. at

132:18–26; 135:2–7.)


86. Scheme. Defendants used interstate wire communications—including email

and electronic filing systems—to further a scheme to obtain Plaintiffs' property

interests and litigation leverage through materially misleading assertions of

criminal wrongdoing, coupled with threats of criminal pursuit and coercive

restraining-order process.


(a) Rule 9(b) Wire Fraud Particularity (key transmissions)

87. (Wire Fraud — June 20, 2024, E-Filing to Obtain Ex Parte Restraints and Firearm Surrender.) On or about June 20, 2024, Defendants Sheila Charlton and Deborah Pauly (acting as counsel/agent) used electronic filing to transmit to the Orange County Superior Court (Elder Abuse/Probate) an EA-100 Petition and EA-110 Temporary Restraining Order application seeking ex parte restraining-order relief, including orders requiring firearm surrender and related coercive restrictions. The June 20 filings asserted, among other things, that Plaintiffs posed an immediate safety threat and advanced a criminality narrative (including allegations framed as "fraud" and other misconduct) to support emergency relief. On information and belief, these electronically transmitted assertions were material to the Court's ex parte issuance and continued maintenance of coercive restraints and were made as part of a scheme to obtain Plaintiffs' property interests and bargaining leverage through the wrongful use of judicial process and criminal-stigma pressure. The use of electronic filing and related email/wire transmissions to submit and prosecute these materials constitutes use of interstate wires in furtherance of the scheme within the meaning of 18 U.S.C. § 1343.

88. 10/21/2024 quid-pro-quo wire transmission (criminal threat → property surrender). On October 21, 2024, Defendant Deborah Pauly, acting through Lex Rex Institute, transmitted by email to Plaintiffs' counsel a written quid-pro-quo

framing "benefits" to Plaintiff Trent including that he "avoids criminal charges,"
while urging counsel to emphasize "provable wire fraud," conditioned on surrender
of Plaintiffs' property interests. This transmission advanced the scheme by
converting a manufactured criminal-fraud narrative into explicit property-
extraction leverage.

89. The Court itself noted the extraordinary expansion of the proceeding beyond
counsel's confirmed estimate (Oct. 15, 2024, Tr. at 56:4–13; Feb. 6, 2025, Tr. at
51–53), supporting Plaintiffs' allegations that the process was used as leverage
rather than pursued as a narrowly tailored protective matter.

90. 12/01/2025 wire transmission (record-sanitization). On or about December 1,
2025, Pauly transmitted by email to counsel/Guardian a request for "no malice"
language in connection with the record of the proceedings, reflecting
consciousness of wrongdoing and an attempt to influence how intent and improper
purpose would be reflected.

Each of the foregoing email and electronic-filing transmissions was sent via the
Internet and/or electronic case-filing infrastructure that constitutes an interstate
wire facility, satisfying the interstate-commerce element of 18 U.S.C. § 1343.

(b) Extortion Structure (Hobbs Act) — corroborated and documented

91. Extortionate leverage. Defendants used threats of criminal pursuit and reputational stigma as leverage to induce property surrender, as memorialized in the October 21, 2024, email (Table X, Item 8) and corroborated under oath in February 11, 2025, testimony (Table X, Item 9) acknowledging the property-for-criminal-pursuit structure.

Each of the foregoing email and electronic-filing transmissions was sent via the Internet and/or electronic case-filing infrastructure that constitutes an interstate wire facility, satisfying the interstate-commerce element of 18 U.S.C. § 1343.

92. Defendants repeatedly characterized the dispute as criminal 'wire fraud' and dangerous elder abuse requiring extraordinary restraints, while simultaneously tying the relief sought to changes in title/ownership. After neutral notice that restraining orders were not appropriate, Defendants continued to use the same criminal-stigma framing and threat leverage in communications and filings.

(c.) Pattern, Continuity, and Proximate Cause

93. The predicate acts are related by common participants, common victims, common purpose, and common methods.

94. Closed-ended continuity: Defendants related racketeering acts occurred repeatedly over a substantial period (at least May 2020 through February 2025), with a consistent objective and method—obtaining Plaintiffs' property interests through fear of criminal accusation and coercive legal process.

95. Open-ended continuity: Defendants' conduct reflects a method and practice— using threats of criminal accusation coupled with protective-order process (and related communications) to extract collateral property concessions—that projects into the future and presents a threat of repetition through renewed threats of criminal referral, renewed reporting, and/or renewed protective-order filings arising from the same nucleus of operative facts.

96. Proximate injury to business or property (both Plaintiffs). Plaintiffs' injuries

were the direct and foreseeable result of Defendants' wire-based scheme: the

criminality narrative and quid-pro-quo threats were used to obtain and maintain

coercive restrictions and to force Plaintiffs to incur substantial, non-duplicative

losses responding to the campaign. Emily Charlton suffered direct injury to

property and economic interests, including firearm-related storage and compliance

costs incurred during the TRO period, attorneys' fees and litigation expenses paid

from joint and/or community funds to defend against Defendants' coercive

campaign, and continued financial burdens associated with the Follyhatch Property

(including mortgage and property-tax obligations) notwithstanding Plaintiffs' lack

of access to or use of the property since approximately April 2020. Defendants'

conduct also impaired and encumbered Emily Charlton's ownership interests by

leveraging restraining-order process and criminal accusations to maintain exclusive

control and to pressure changes in title and ownership. These are concrete, non-

speculative injuries to "business or property" proximately caused by Defendants'

racketeering conduct.


97. Not mere petitioning; extortionate and coercive use of process. Plaintiffs do not

seek liability merely for Defendants' act of petitioning. The racketeering claim is

premised on Defendants' use of wire communications and threats of criminal

prosecution as leverage to obtain property concessions, including a written quid-pro-quo demand tying "avoids criminal charges" to property surrender, and continued prosecution despite neutral notice that restraining orders were not appropriate and despite ultimate denial and dissolution of the TRO.

98. As a practical consequence of the TRO enforcement regime, firearms associated with the Charlton household—including firearms attributable to Emily Charlton—were surrendered for paid storage and compliance, generating concrete out-of-pocket costs and depriving Emily of possession and access during the TRO period despite her non-respondent status.

## IX. CLAIMS FOR RELIEF

COUNT 1 — Violation of 18 U.S.C. § 1962(c) (RICO)

(Against All Defendants)

99. Defendants' conduct was directed at Plaintiffs shared household and property interests and proximately caused injury to both Trent and Emily Charlton, including the economic and property harms alleged above.

100. Plaintiffs reallege and incorporate by reference all prior paragraphs as though
fully set forth herein.

101. Defendants conducted and participated in the conduct of the Enterprise's
affairs through a pattern of racketeering activity including Hobbs Act extortion and
wire fraud.

102. Plaintiffs were injured in their business or property by reason of Defendants'
violation of 18 U.S.C. § 1962(c).

103. Plaintiffs seek damages, treble damages, costs, and reasonable attorney's fees
as authorized by 18 U.S.C. § 1964(c).

COUNT 2 — Violation of 18 U.S.C. § 1962(d) (RICO Conspiracy)

(Against All Defendants)

104. Defendants' conduct was directed at Plaintiffs shared household and property
interests and proximately caused injury to both Trent and Emily Charlton,
including the economic and property harms alleged above.

105. Plaintiffs reallege and incorporate by reference all prior paragraphs as though fully set forth herein.

106. Defendants knowingly agreed and conspired to violate 18 U.S.C. § 1962(c) by conducting and participating in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

107. Plaintiffs were injured by reason of Defendants' conspiracy and seek relief under 18 U.S.C. § 1964(c).

COUNT 3 — Malicious Prosecution (California) – (Trent Charlton only)

(Against All Defendants)

108. Plaintiffs reallege and incorporate by reference all prior paragraphs as though fully set forth herein.

109. Defendants initiated and continued the EARO Proceeding against Trent
Charlton.

110. The proceeding terminated in Trent Charlton's favor on February 19, 2025,
when the Court denied the petition in its entirety and dissolved the TRO. (Ex. B.)

111. Defendants lacked probable cause to continue the proceeding, at minimum
after the Guardian ad Litem concluded in writing that restraining orders were not
an appropriate solution. (Ex. C.)

112. Defendants acted with malice and improper purpose, including using the
proceeding to extract Plaintiffs' property interests through threats of criminal
pursuit, as corroborated by Exhibit A and Sheila Charlton's February 11, 2025,
sworn testimony.

113. Trent Charlton suffered damages as a direct and proximate result, including
substantial out-of-pocket losses (including attorneys' fees and related costs

incurred to defend and defeat the proceeding), reputational harm, and emotional distress.

114. Plaintiffs' injuries include the economic and property harms described above, including firearm-related compliance costs, attorneys' fees and litigation expenses, and impairment of Plaintiffs' ownership interests and control.

COUNT 4 — Abuse of Process (California)

(Against All Defendants)

115. Defendants' conduct was directed at Plaintiffs shared household and property interests and proximately caused injury to both Trent and Emily Charlton, including the economic and property harms alleged above.

116. Plaintiffs reallege and incorporate by reference all prior paragraphs as though fully set forth herein.

117. Defendants used legal process primarily for an ulterior purpose: to coerce Plaintiffs to surrender property interests and to obtain leverage through coercive restrictions, reputational stigma, and mounting economic pressure.

118. Defendants committed willful acts not proper in the regular conduct of proceedings, including: (a) pursuing restraining-order process to advance a property-control objective after the DVRO track failed to produce the requested relief; (b) continuing prosecution after neutral notice that restraining orders were "not appropriate solutions" (Ex. C); (c) prolonging the proceedings far beyond the time estimate confirmed to the Court for scheduling purposes, as the Court expressly noted on February 6, 2025; and (d) using threats of criminal pursuit as leverage to induce property surrender, including as memorialized in Exhibit A and corroborated under oath on February 11, 2025.

119. Plaintiffs suffered damages as a direct and proximate result, including substantial out-of-pocket losses (including attorneys' fees and related costs incurred in defending and defeating the restraining-order proceedings), firearm-related storage and compliance costs, and other economic harms tied to Defendants' coercive use of process.

120. Defendants' misuse of process was directed at Plaintiffs' shared household
and property interests and proximately caused injury to both Trent and Emily
Charlton, including impairment and encumbrance of their ownership interests and
control with respect to the Follyhatch Property, and the firearm-related
deprivations and costs experienced during the TRO period, notwithstanding that
Emily Charlton was not named as a respondent.


COUNT 5 — Violation of Cal. Civ. Code § 52.1 (Bane Act)

(Against All Defendants)

121. Defendants' conduct was directed at Plaintiffs shared household and property
interests and proximately caused injury to both Trent and Emily Charlton,
including the economic and property harms alleged above.


122. Plaintiffs reallege and incorporate by reference all prior paragraphs as though
fully set forth herein.

123. Defendants interfered with, or attempted to interfere with, Plaintiffs'

constitutional and statutory rights by threats, intimidation, and coercion, including

threats of criminal accusation/prosecution coupled with demands and pressure for

property surrender.

124. Defendants' threats and coercive criminality narrative—directed primarily at

Plaintiff Trent Charlton and at Plaintiffs shared household and property—

foreseeably restricted Emily Charlton's liberty of movement and sense of personal

security, including interference with Plaintiffs' routine daily walks and access to

the Great Park during the TRO period, and contributed to anxiety requiring

medical attention.

125. Defendants acted with the specific intent to deprive Plaintiffs of protected

rights and to obtain property through coercion, as evidenced by Exhibit A, Sheila

Charlton's February 11, 2025 sworn testimony, the GAL's findings (Ex. C), and the

Court's February 19, 2025 ruling and minute order denying restraining-order relief

in its entirety and dissolving the TRO (Ex. B).

126. Plaintiffs are entitled to damages, exemplary damages where authorized, attorney's fees where authorized, and injunctive relief as permitted by Cal. Civ. Code § 52.1.

127. Plaintiffs' injuries include the economic and property harms described above, including firearm-related compliance costs, attorneys' fees and litigation expenses, and impairment of Plaintiffs' ownership interests and control.

X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

A. Compensatory damages according to proof (including out-of-pocket losses presently estimated at approximately $76,750);

B. Treble damages under 18 U.S.C. § 1964(c);

C. Punitive or exemplary damages where authorized;

D. Declaratory relief consistent with the causes of action pled;

E. Injunctive relief tailored to prevent Defendants from using threats of criminal

accusation/prosecution and protective-order process as leverage to coerce collateral

property surrender arising from the same nucleus of operative facts;

F. Costs of suit and attorney's fees where authorized by statute; and

G. Such other and further relief as the Court deems just and proper.

XI. DEMAND FOR JURY TRIAL

128. Plaintiffs demand trial by jury on all issues so triable.

Dated: January 20, 2026

TRENT CHARLTON, Pro Se

135 Carrotwood

Irvine, CA 92618

Telephone: (949) 444-6857

Email: macmovieman@gmail.com

EMILY CHARLTON, Pro Se

135 Carrotwood

Irvine, CA 92618

Telephone: (949) 533-3953

Email: macwife@gmail.com

APPENDIX A — EXHIBITS (A–C ONLY)

Exhibit A: October 21, 2024, Email from Defendant Pauly

A true and correct copy of an email dated October 21, 2024, from Defendant Deborah L. Pauly to Plaintiffs' counsel is attached hereto as Exhibit A.

Exhibit B: February 19, 2025, Court Minute Order / Ruling (EARO Denied; TRO Dissolved; CCP § 918 Motion Denied)

A true and correct copy of the Court's February 19, 2025, minute order and/or written ruling denying the EARO petition in its entirety, dissolving the Temporary Restraining Order, denying any request to extend the TRO, and denying Defendant Pauly's CCP § 918 motion to stay enforcement pending appeal, is attached hereto as Exhibit B.

Exhibit C: September 6, 2024 Guardian ad Litem Report

A true and correct copy of the Guardian ad Litem Report dated September 6, 2024, is attached hereto as Exhibit C.

---------- Forwarded message ---------
From: <dpauly@lexrex.org>
Date: Mon, Oct 21, 2024 at 7:36 PM
Subject: In the Matter of Charlton: Financial Elder Abuse
To: David Stein <dstein@steindefense.com>
CC: <dpauly@lexrex.org>


David,

Per our discussion at 12:30 today, here are the major deal points that might lead to settlement and
cessation of further litigation, which will include turning over the Probate Court record to the OC
District Attorney's Office and a civil complaint to disgorge fraudulent profit and damages, plus
attorney's fees.

1. Deed must be placed in Shiela's name, so she has freedom to sell.
2. Disentangle the parties from joint ownership by selling the Follyhatch property.
3. Sheila to pay off the mortgage. (She does not trust that Trent will handle this.)
4. Calculate for what Trent has paid into the property, less his pre-existing debt that was rolled
   into the total mortgage amount that was financed.
5. If Trent has placed any lean or debt against the property, he must clear it so we have clean
   title for the sale.
   a. I don't know whether he has leveraged the property further than he already did in
      the past. I just know that he is prone to it because he has done so twice before. So,
      you need to find out.

Benefits to Trent:

1. He avoids criminal charges.
   a. You need to impress upon him that we are talking about provable wire fraud.
   b. He defrauded First American, too, by leading them to believe he was the source of
      the $470K down payment on the property, which is why they were willing to roll $56K
      of pre-existing debt into the mortgage. I will not hesitate to bring this to their
      attention. Trent needs to understand that.
2. He avoids additional litigation with civil suit that will be filed concurrent with turning over
   the Probate Record to the DA.
3. He avoids having us subpoena his financial records.
4. He will walk away with some proceeds.
5. He will be out from under the mortgage and property tax payments.
6. If we can get a stipulation in place before Thursday afternoon, he may avoid taking the stand
   on the Financial Elder Abuse matter, which will be used to further the criminal and civil
   charges that will otherwise be forthcoming against him.

At this point, my client wants to cut all ties with Trent and is very adamant about the Permanent
Restraining Order.

If we can work these other deal points, I may be able to impress upon her that an RO is not necessary because she can move from such close proximity to him.

Playing off the brainstorming with Rod on Friday, perhaps a contractual agreement to stay away will be adequate.

If we cannot work these things out, Sheila will be asking for the Permanent Restraining Order. You and I both know the court will be inclined to grant it. So, the final, and perhaps biggest benefit to Trent is that he will not have that cloud of a PRO hovering over as a black mark to his credit, reputation, and job related opportunities.

I do hope you and I can work this out for everybody's sake. Let me know what I can do to help you.


Deborah L. Pauly, Esq.

Attorney-at-law

LEX REX INSTITUTE

444 W. Ocean Boulevard, Suite 1403

Long Beach, CA 90802

Office: (562) 435-9062

Cell: (562) 264-5515

http://www.LexRex.org

This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential, and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender at (562) 435-9062 immediately by telephone or by return e-mail and delete this message, along with any and all attachments, from your computer. Further this message, and all attachments, are or may be covered by the Electronic Communications Privacy Act, 18 U.S.C. § 2510, et seq.

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE | |
|---|---|
| Costa Mesa Justice Complex<br>3390 Harbor Boulevard<br>Costa Mesa, CA 92626 | |
| **SHORT TITLE:** Charlton - Elder Abuse | |
| **CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE** | CASE NUMBER:<br>**30-2024-01406840-PR-OP-CMC** |

I certify that I am not a party to this cause. I certify that that the following document(s), Minute Order dated 02/20/25, Minute Order dated 02/19/25, was transmitted electronically by an Orange County Superior Court email server on February 20, 2025, at 10:35:58 AM PST. The business mailing address is Orange County Superior Court, 700 Civic Center Dr. W, Santa Ana, California 92701. Pursuant to Code of Civil Procedure section 1013b, I electronically served the document(s) on the persons identified at the email addresses listed below:

DAVID A. STEIN
DSTEIN@STEINDEFENSE.COM

LEX REX INSTITUTE
DPAULY@LEXREX.ORG

W. ROD STERN
RSTERN@MURTAUGHLAW.COM

Clerk of the Court, by: *H. Bradley* , Deputy

**CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE**

Code of Civ. Procedure , § CCP1013(a)

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

## MINUTE ORDER

DATE: 02/20/2025                    TIME: 10:26:00 AM          DEPT:  C27

JUDICIAL OFFICER PRESIDING: Bradley Erdosi
CLERK: H. Bradley
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT: None

CASE NO: **30-2024-01406840-PR-OP-CMC**   CASE INIT.DATE: 06/20/2024
CASE TITLE: **Charlton - Elder Abuse**
CASE CATEGORY: Probate                    CASE TYPE: Other Probate Matter

EVENT ID/DOCUMENT ID: 74493900
**EVENT TYPE:** Nunc Pro Tunc Minutes

---

**APPEARANCES**

---

There are no appearances by any party.

It appearing to the Court that through error or inadvertence, the minute order of this Court dated 02/19/2025, does not properly reflect the order of the Court. Said minute order is ordered corrected Nunc Pro Tunc as of 02/19/2025, as indicated below:

**ADD:**

Restraining order as requested is **denied with prejudice** in its entirety.

*All other aspects of the minute order remain in full force and effect.*

---

DATE: 02/20/2025                          MINUTE ORDER                          Page 1
DEPT:  C27                                                                Calendar No.

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER**

### MINUTE ORDER

DATE: 02/19/2025                    TIME: 01:30:00 PM              DEPT: C27

JUDICIAL OFFICER PRESIDING: Bradley Erdosi
CLERK: H. Bradley
REPORTER/ERM: Kaitlyn Lancaster CSR# 13573
BAILIFF/COURT ATTENDANT: W. Ruiz

CASE NO: **30-2024-01406840-PR-OP-CMC**   CASE INIT.DATE: 06/20/2024
CASE TITLE: **Charlton - Elder Abuse**
CASE CATEGORY: Probate                    CASE TYPE: Other Probate Matter

---

EVENT ID/DOCUMENT ID: 74489574,122388353
**EVENT TYPE:** Order to Show Cause re: Elder Abuse
MOVING PARTY: Sheila Charlton
CAUSAL DOCUMENT/DATE FILED: Request for Elder or Dependent Adult Abuse Restraining Order, 06/20/2024

---

**APPEARANCES**
Attorney Deborah Pauly, for Petitioner, present.
Petitioner Sheila Charlton present.
Attorney David Stein, for Respondent, present.
Respondent Trent Charlton present.
Guardian Ad Litem W. Rod Stern present remotely.

Hearing held, all participants appearing remotely.

01:41PM Court reconvenes in this matter, with parties and counsel present.

The Court, having taken the above-entitled matter under submission on 02/11/2025 and having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules as follows:

The Court finds there is insufficient evidence to satisfy the preponderance standard, as fully set forth on the record.

Restraining order as requested is denied in its entirety.

The Court orders Temporary Restraining Order dissolved.

Respondent's Motion to Dismiss is deemed moot, and the hearing on 05/07/2025 is therefore vacated.

Attorney Deborah Pauly presents a motion to stay enforcement of judgement pending appeal pursuant to CCP § 918, which is filed in the department this date. The Court denies the motion and the request to extend the Temporary Restraining Order.

Attorney David Stein declines to stipulate to the return of exhibits; instead, he requests the exhibits remain with the court pending appeal. After discussion, the Court orders that the admitted exhibits are to be retained, however all other exhibits are returned to the parties in open court this date pursuant to the

---

DATE: 02/19/2025                         MINUTE ORDER                              Page 1
DEPT: C27                                                                   Calendar No.

stipulation of the parties.

Attorney W. Rod Stern is relieved as Guardian Ad Litem. He represents that he will file a fee petition through the probate court.

Court orders the Clerk to provide electronic notice.

1    W. Rod Stern (Bar No. 110003)
     MURTAUGH TREGLIA STERN & DEILY
2    LLP
     2603 Main Street, Penthouse
3    Irvine, California 92614
     (949) 794-4000/FAX (949) 794-4099
4    rstern@murtaughlaw.com

5    Guardian ad Litem for Sheila Charlton

6

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            COUNTY OF ORANGE, COSTA MESA JUSTICE COMPLEX

10

11   CHARLTON – ELDER ABUSE            CASE NO. 30-2024-01406840-PR-OP-CMC

12                                     Dept: CM-06

13                                     **REPORT OF GUARDIAN AD LITEM**

14                                     Time: 8:45 a.m.
                                       Date: Sept. 10, 2024
15                                     Dept: CM-06

16                                     TRIAL DATE: None set

17

18        Guardian ad Litem, W. Rod Stern, submits this report and recommendation regarding

19   the Request for Elder or Dependent Adult Abuse Restraining Orders sought by Shiela Charlton

20   against Trent Charlton.

21        Based upon a lengthy, in-person interview with Sheila Charlton ("Sheila"), and a

22   phone interview with Trent Charlton ("Trent"), Guardian ad Litem believes the restraining

23   orders sought in the Request – (prohibition on physical abuse, financial abuse, intimidation,

24   etc.; prohibition on contact with the person; and stay-away orders – are not appropriate

25   solutions for the issues being raised by Sheila.

26        Sheila alleges that her son (and former attorney-in-fact), Trent, tricked her into selling

27   her residence in Cypress, CA, and purchasing a home in Irvine, CA, in 2019. She

28   acknowledges being aware of the transaction when it occurred, and acknowledges that Trent

MURTAUGH TREGLIA
STERN & DEILY LLP

3221782                              - 1 -

REPORT OF GUARDIAN AD LITEM

agreed to make the mortgage payments on the Irvine residence (and has made the payments), but does not believe that she agreed that Trent and his wife would become owners of a 2/3 interest in the residence as joint tenants with Sheila. Further, she alleges that in 2020 or 2021 Trent diverted her tax refund and COVID stimulus payments to Trent's bank account, rather than Sheila's account. She further alleges that Trent has wired the Irvine residence to allow Trent to monitor and control Sheila.

While Guardian ad Litem is unable to determine whether or not the allegations are true, the allegations do not appear to present the type of threat that may be properly addressed by the requested protective orders. If supported by evidence, the claims of past financial misconduct using a now-revoked power of attorney might be better addressed by a lawsuit alleging fraud and financial elder abuse, as well as other claims. There does not appear to be ongoing conduct suggesting the need for a protective order.

**Background**

The Request for Elder or Dependent Adult Abuse Restraining Orders was filed on June 20, 2024.

W. Rod Stern was appointed to serve as guardian ad litem for Sheila on July 17, 2024.

Guardian ad Litem has reviewed the Request filed on June 20, 2024, as well as medical records provided by Sheila's attorney. Guardian ad Litem has also reviewed various real estate and financial documents, as well as photos, provided by the party's attorneys.

On August 30, 2024, Guardian ad Litem met in person with Sheila for approximately 1½ hours. Sheila was alert and told Guardian ad Litem the full story consistent with the allegations in her Request. Sheila shared a stack of documents with Guardian ad Litem reflecting the sale of her Cypress residence and purchase of the Irvine residence, as well as copies of IRS documents and correspondence related to the allegation that Trent diverted her tax refund and COVID stimulus payment. Sheila's allegations of ongoing conduct by Trent included claims that he caused her large-screen television to stop working, redirected her doorbell camera so he could monitor who came and went from the house, and otherwise controlled the electronics in the home.

1       On September 3, 2024, Guardian ad Litem spoke with Trent by phone for more than 30

2   minutes. [1] Trent acknowledges a long history of a difficult relationship with his mother but

3   denies the allegations. He claims the idea to move to Irvine was Sheila's.

4   **Conclusion**

5       For the reasons set forth above, Guardian ad Litem recommends that the Request for

6   Restraining Orders be denied and suggests that alternative actions and remedies be considered

7   by Sheila. Guardian ad Litem does not have an opinion as to whether or not alterative actions

8   will be successful.

9       Dated:  September 6, 2024        MURTAUGH TREGLIA STERN & DEILY LLP

10

11              By: _____

12                   W. Rod Stern
                     Attorneys for Defendant
13                   Sheila Charlton

14

15

16

17

18

19

20

21

22

23

24

25

---

26  [1] At the beginning of the phone conversation with Trent, Guardian ad Litem disclosed that he learned during the meeting with Sheila that Guardian ad Litem's law partner represented Trent

27  and Trent's wife in a separate matter. Guardian ad Litem offered to withdraw from this case if Trent elected. Trent chose to waive the potential conflict and asked Guardian ad Litem to stay

28  on the matter. Guardian ad Litem has walled himself off from Trent's file and has not accessed the file in any way.

## PROOF OF SERVICE

I, the undersigned, declare as follows:

I am employed in the County of Orange, State of California.  I am over the age of 18 years, and not a party to the within action.  I am an employee of or agent for MURTAUGH TREGLIA STERN & DEILY LLP, whose business address is 2603 Main Street, Penthouse, Irvine, California 92614.

On September 6, 2024, I served the foregoing document(s):

### REPORT OF GUARDIAN AD LITEM

on the following parties in this action addressed as follows:

### SEE ATTACHED SERVICE LIST

☒    *(BY E-MAIL)* I personally transmitted said document(s) electronically, or caused them to be transmitted electronically, to the parties at their email address(es) on the attached Service List, pursuant to C.C.P. Section 1010.6 and C.R.C. Rules 2.256 and 2.251.

Executed on September 6, 2024, at Irvine, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

*Crystal Vazquez*
_____
**CRYSTAL E. VAZQUEZ**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MURTAUGH TREGLIA
STERN & DEILY LLP

**SERVICE LIST**
Charlton - Elder Abuse
Costa Mesa Justice Complex
CASE NO.: 30-2024-01406840-PR-OP-CMC
Our File No.: 558-23900

David A. Stein                                    Attorney for Trent Charlton
The Law Offices of David A. Stein
19200 Von Karman Ave Ste 400          dstein@steindefense.com
Irvine, CA 92612-8512

Deborah L. Pauly                                Attorney for Sheila Charlton
LEX REX INSTITUTE
444 West Ocean Boulevard, Suite 1403    dpauly@LexRex.org
Long Beach, CA 90802

**PROOF OF SERVICE**